IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HETTY A. VIERA, as the | : | CIVIL ACTION |
| executrix of THE ESTATE OF | : | NO. 09-3574 |
| FREDERICK A. VIERA, and HETTY | : | |
| A. VIERA, individually, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LIFE INSURANCE COMPANY OF | : | |
| NORTH AMERICA, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    AUGUST 3, 2012

I.    INTRODUCTION

        Plaintiff Hetty Viera ("Plaintiff") brings this action
pursuant to the Employee Retirement Income and Security Act
("ERISA"), 29 U.S.C. § 1132(a)(1)(B) seeking payment of benefits
under an accidental death and dismemberment policy arising from
the death of her husband Frederick Viera ("Viera").[1]  On October
14, 2008, Viera was involved in a motorcycle accident in Grand
Junction, Colorado.  Viera suffered serious injuries as a result

_____

[1]        ERISA allows an individual to bring a civil action "to
recover benefits due to him under the terms of his plan, to
enforce his rights under the terms of the plan, or to clarify
his rights to future benefits under the terms of the plan."  29
U.S.C. § 1132(a)(1)(B) (2006).

of the accident.  He was briefly treated at St. Mary's Hospital and Medical Center and was subsequently pronounced dead. Defendant Life Insurance Company of North America ("Defendant") denied benefits under an accidental death and dismemberment policy.

Following a bench trial and pursuant to Federal Rule of Civil Procedure 52(a), this Memorandum constitutes the Court's findings of fact and conclusions of law.  For the reasons that follow, the Court will grant judgment in favor of Plaintiff.


## II.  PROCEDURAL BACKGROUND

After Defendant denied Plaintiff benefits at the administrative level, Plaintiff filed suit on July 10, 2009. The parties submitted cross-motions for summary judgment.  On April 6, 2010, upon consideration of the parties' cross-motions for summary judgment, the Court granted Defendant's motion for summary judgment and denied Plaintiff's motion for summary judgment.  In doing so, the Court evaluated Defendant's denial of benefits under the deferential abuse of discretion standard because the policy language in the plan stated that proof of loss must be "satisfactory to [Defendant]."  Viera v. Life Ins. Co. of N. Am., No. 09-3574, 2010 WL 1407312, at *4 (E.D. Pa.

Apr. 6, 2010).  The parties submitted competing medical expert opinions on Viera's cause of death.  Under the abuse of discretion standard, the Court found no abuse of discretion when the administrator chose to credit one medical opinion over another.  See id. at *8 (stating courts in ERISA context "have recognized that the decision of a plan administrator will not be deemed an abuse of discretion merely because it chooses among competing medical opinions").  The Court concluded that the evidence supported Defendant's decision to deny benefits because there was reasonable medical evidence that the death was caused, at least in part, by Viera's use of the blood thinner Coumadin® ("Coumadin").[2]  Id. at *7-8.

In addition, the Court denied Plaintiff's motion for summary judgment based upon an interpretation of the accidental death and dismemberment policy.  Specifically, the Court held that a medical condition exclusion in this policy excluded from a covered injury or loss such injuries or losses that were directly or indirectly, in whole or in part, caused by medical or surgical treatment of any of the following: sickness, disease, bodily or mental infirmity, or bacterial or viral

---

[2]     Coumadin, known generically as warfarin sodium, is the brand name of a blood-thinning drug prescribed for the prevention and treatment of blood clots.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 396 (3d Cir. 2000).

infection.  See id. at *11 (rejecting Plaintiff's argument that phrase "medical or surgical treatment thereof" applied only to "bacterial or viral infection[s]" and not entire list of ailments).

On appeal, the Third Circuit held that the Court erroneously reviewed Defendant's decision under the abuse of discretion standard and remanded the case for the Court to review de novo whether Defendant properly denied benefits.  See Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 418 (3d Cir. 2011).  The Third Circuit also, however, affirmed the Court's interpretation of the medical condition exclusion.  Id. at 419-20.  After the Third Circuit remanded the case, the Court held a status and scheduling conference.  At that conference, the Court ordered the parties to submit briefing on how the Court was to conduct this de novo review.  The Court issued a memorandum and order concluding that the current administrative record was sufficient, along with the parties' experts' reports and video trial deposition cross-examination of those experts, to conduct its de novo review.  See Order, May 14, 2012, ECF No. 50; Mem. Op., May 14, 2012, ECF No. 49; Order, June 6, 2012, ECF No. 58.  The Court held a bench trial at the conclusion of which it heard closing argument.  The Court has reviewed all of the admitted evidence in this case: the Administrative Record, the expert

4

opinions of Drs. Mark Eaton and Aaron Gindea, and the video trial depositions of Drs. Mark Eaton and Aaron Gindea.[3]  Upon this record, the Court now conducts its de novo review.


## III. FINDINGS OF FACT

A.   Background

On the date of his death, Viera maintained two insurance policies, which were purchased on his behalf by his employer, Hornbeck Offshore Operators, L.L.C.  R. at 209-10.[4] These insurance policies consisted of an employer-provided life insurance policy, No. FLX 960990, R. at 231-262, and an employer-provided accidental death and dismemberment policy (the "AD & D Policy" or the "Policy"), No. OK961030.  R. at 11-43. The claims administrator for each of these policies is Defendant.  Only the AD & D Policy is the subject of the instant litigation.

Viera had a pre-existing medical condition known as atrial fibrillation before Defendant issued the AD & D Policy.

---

[3]     The Court reviewed the objections counsel made during the video trial depositions.  The Court did not base any of its findings of fact or conclusions of law on any of the objected-to testimony.

[4]     All citations herein are to the Administrative Record.

As part of the medical treatment for his atrial fibrillation, Viera received a medication called Coumadin.  See id. at 135-38.

## B.   Viera's Motorcycle Accident

On October 14, 2008, Viera was involved in a head-on motorcycle versus car accident in Grand Junction, Colorado. Viera suffered serious injuries as a result of the accident.  He was treated at St. Mary's Hospital and Medical Center ("St. Mary's") for approximately three hours and was subsequently pronounced dead.

## C.   Treatment at St. Mary's Hospital

Plaintiff's treatment was extensive.  Upon arrival at St. Mary's, Plaintiff received four units of fresh frozen plasma, along with vitamin K.  R. at 85.  During the course of his treatment, Plaintiff received an additional four units of fresh frozen plasma and eight units of blood, along with some medicines.  Upon arrival in the emergency room, Viera's INR was 2.8.[5]  R. at 87.  Viera also had an APTT of 41 at the time of his

---

[5]     INR stands for "International Normalized Ratio" and is a standard measure of the time it takes a patient's blood to clot.  See Gindea Dep. 19:3-9, July 18, 2012.  An INR of 2.8 means that it takes that person 2.8 times longer to clot than a "normal person."  Id. at 19:9.  In Viera's case, an INR of 2.8

admittance to the emergency room.[6]  Approximately two hours after
Viera began treatment at St. Mary's, his INR was 2.9, and his
APTT was 187.  R. at 87.  This APTT was noted on his laboratory
report as a "critical value."  R. at 88.  Over this same time,
several of Viera's other blood values fell from a normal value
to a low value.[7]  R. at 87.

It was determined that Viera had incurred numerous
injuries from his head-on motorcycle accident.  The lead
emergency room physician was Dr. Michael Bradshaw.  Dr. Bradshaw
reported in the "Death Summary" that Viera suffered multiple
pelvic fractures, complex fractured nerves and blood vessels in
the pelvic area, lacerated iliac arteries, "significant bruising
and swelling in the pubic region and pelvic area[,] [h]is left
knee was extremely loose and contused[,] [and] [h]is left foot
was extremely contused and misshapen."  R. at 84-85.  Viera's
injuries were such that he could not move his lower body.  R. at
85.  A surgeon "embolized" both internal iliac arteries and

is within the acceptable range for someone on Coumadin.  Id. at
20:6-9; Eaton Dep. 22:16-24, July 16, 2012.

[6]      APTT stands for the "activated partial thromboplastin
time," and it measures the effectiveness of the "intrinsic
clotting system."  Gindea Dep. 20:18-23.  A normal APTT range is
from 23 to 40.  Id. at 20:23.

[7]      Viera's platelet count dropped from 238,000 to
107,000.  R. at 87.  In addition, his hematocrit dropped from
41.8 to 25.6.  Id.

observed there was "active brisk bleeding from the right internal iliac distribution."  Id.

Dr. Bradshaw noted that throughout Viera's treatment his blood pressure was generally unstable.  Although Viera's blood pressure became more stable after the embolization of the iliac arteries, it soon began to drop again.  Id.  After Viera again became unstable, emergency room physicians were unable to revive him and he passed away at 7:51 p.m.  Dr. Bradshaw's "Final Diagnosis" was as follows: "Multiple injuries in a head-on motorcycle versus car accident with severe pelvic fractures, lower extremity fractures, and a fully Coumadinized patient due to atrial fibrillation.  He eventually expired because of unresponsiveness to blood pressure and cardiac output."  R. at 86.  A reviewing physician, Dr. David James, provided this assessment of Viera's condition: "Severe injuries including bleeding pelvic fractures being embolized.  Very poor perfusion with difficult to assess pulses."  R. at 100.  Lastly, the emergency room report is consistent with Dr. Bradshaw's report in the "Death Summary."  This emergency room report provides the "Final Assessment" as follows:

1. Complex pelvic fracture with hemodynamically significant bleeding.
2. Patient on Coumadin with therapeutic INR significantly complicating trauma management.

8

3.   Potential spinal cord injury with paresthesias in right leg and no clear movement noted in either leg.
4.   Severe acidosis and prolonged and recurring hypotension.
5.   Respiratory failure likely due to hypotension and acidosis requiring endotracheal intubation.

R. at 107.


D.   Corner's Assessment

Dr. Robert A. Kurtzman, a forensic pathologist, performed the postmortem examination and report.  Within that report, he states that the "Immediate Cause of Death" was "Multiple Injuries."  R. at 183.  He states that Viera had the following "Other Significant Conditions": "Arteriosclerotic cardiovascular disease, diabetes mellitus, and atrial fibrillation."  Id.  The postmortem examination provided that Viera had a "pelvic fracture and extensive hemorrhage around the pelvis and retroperitoneum."  Id.  The Colorado State Certificate of Death shows the "immediate cause" of death as "multiple injuries" and lists other conditions "contributing to death" as "Arteriosclerotic Cardi[o]vascular Disease."  R. at 168.

E.    <u>Plaintiff's Claim for Benefits and the AD & D Policy</u>

Plaintiff is Viera's wife and the executrix of his estate.  On November 3, 2008, Plaintiff submitted a claim for benefits under the AD & D Policy to Defendant seeking benefits in the amount of $400,000, but Defendant denied this claim.[8]  <u>See</u> R. at 2.  One relevant provision of the AD & D Policy, defines a "Covered Loss" as:

A loss that is all of the following:

1.    the result, directly and independently of all other causes, of a Covered Accident;
2.    one of the Covered Losses specified in the <u>Schedule of Covered Losses</u>;
3.    suffered by the Covered Person within the applicable time period specified in the <u>Schedule of Benefits.</u>

R. at 27.  Another relevant provision of the AD & D Policy defines a "Covered Accident" as:

A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or a Covered Loss and meets all of the following conditions:

1.    occurs while the Covered Person is insured under this Policy;
2.    is not contributed to by disease, Sickness, mental or bodily infirmity;
3.    is not otherwise excluded under the terms of this Policy.

---

[8]    Plaintiff also submitted a claim under Viera's life insurance policy and received $350,000 from Defendant on account of that claim.

Id.  The AD & D Policy also contains a provision that specifically excludes the following from a claim for benefits:

> [A]ny Covered Injury or Covered Loss which, directly
> or indirectly, in whole or in part, is caused by or
> results from . . . Sickness, disease, bodily or mental
> infirmity, bacterial or viral infection or medical or
> surgical treatment thereof, except for any bacterial
> infection resulting from an accidental external cut or
> wound or accidental ingestion of contaminated food.

R. at 32.  In its denial of benefits, Defendant cited to this exclusion (the "Medical Condition Exclusion").  R. at 46, 60. More specifically, Defendant denied Plaintiff's benefit claim on the ground that Viera's Coumadin treatment complicated his medical treatment and constituted a contributing factor to his death after his accident.  R. at 46-47, 60-61.


F.   Experts' Opinions

     In addition to the medical records, the evidence of record contains two expert reports and their trial deposition testimony.  Defendant's expert is Dr. Mark Eaton.  Plaintiff's expert is Dr. Aaron Gindea.


1.   Dr. Mark Eaton

     Before denying the claim, Defendant retained an independent medical doctor to review the accident reports and hospital records and to render an opinion on the cause of death.

11

Mark H. Eaton, M.D., who is Board Certified in Internal Medicine and has a Specialty Certificate in Cardiovascular Disease, performed the review.  Dr. Eaton has been a cardiologist for sixteen years.  Dr. Eaton graduated from the New York University School of Medicine and engaged in research and clinical fellowships in cardiology thereafter.  After reviewing Viera's records, Dr. Eaton stated, "Mr. Viera's medical history was remarkable for atrial fibrillation diagnosed in 1991 and chronic anti-coagulation with Coumadin.  Mr. Viera had a therapeutic INR noted upon hospital admission."  R. at 72.

Dr. Eaton also noted that when Viera arrived at St. Mary's his INR was at a "therapeutic" level.  Dr. Eaton further testified that these numbers remained stable or even increased during Viera's time at the hospital, meaning that the doctors were unable to reverse the blood-thinning effects of the Coumadin.  See Eaton Dep. 23:10-15.  Dr. Eaton noted that according to the contemporaneous notes of those doctors who were treating Viera, the "Final Assessment" of Viera's treatment and death included the following two points: "(1) Complex pelvic fracture with hemodynamically significant bleeding; and (2) Patient on Coumadin with therapeutic INR significantly complicating trauma management."  R. at 107.  In Dr. Eaton's opinion, these points "clearly indicate[] that the treating

12

providers noted that the patient was on Coumadin and that it complicated their ability to resuscitate and treat this patient." Eaton Dep. 24:19-22.  Dr. Eaton concluded that the Coumadin treatment did contribute to Viera's death:

> To a reasonable degree of medical certainty, Mr. Viera's Coumadin therapy significantly contributed to his death.
>
> The cause of Mr. Viera's death was attributed to the traumatic pelvic fracture which resulted in clinically significant pelvic and retroperitoneal hemorrhage complicated by the fact that the claimant was systemically anti-coagulated.  Mr. Viera was at therapeutic pro-time and INR upon hospital presentation.  The claimant was taking Coumadin to prevent a thromboembolic event given known atrial fibrillation.  Despite aggressive fluid and blood product resuscitation[,] hemodynamic instability persisted resulting ultimately in a cardiac arrest.
>
> Potential adverse reactions to Coumadin are known to include fatal or nonfatal hemorrhage from any tissue or organ as a consequence of the anticoagulant effect. The sign, symptoms, and severity will vary according to the location and degree or extent of the bleeding.
>
> In my opinion the claimant's Coumadin therapy significantly contributed to his death as it is more than likely he would have survived the traumatic pelvic fracture if he had not been fully anti-coagulated at the time of his injury.  In my opinion the aggressive resuscitation efforts including emergent angiography and embolization procedure would have resulted in hemodynamic stability if he had not been taking Coumadin.

R. at 72-73.  Dr. Eaton did testify, however, that Dr. Kurtzman's report does not list Coumadin as a cause or contributor to his death.  Eaton Dep. 59:12-17.

2.  <u>Dr. Aaron Gindea</u>

Plaintiff retained her own medical expert, Dr. Aaron Gindea.  Aaron Gindea, M.D., is also Board Certified in Internal Medicine and has a Specialty Certificate in Cardiology.  Dr. Gindea has been a cardiologist for twenty-two years.  Dr. Gindea also graduated from the New York University School of Medicine and engaged in research and clinical fellowships in cardiology thereafter.  After review of the medical records and Dr. Eaton's expert report, Dr. Gindea opined, "[I]t is unreasonable to propose that, if not for the [Coumadin], the patient likely would have survived."  Letter from Dr. Aaron Gindea, Oct. 29, 2009, Tr. Ex. A.  At his trial deposition, Dr. Gindea testified that he considered all of Viera's blood values when making his conclusion.  Specifically, Dr. Gindea explained that the blood-thinning effects of the Coumadin would have been reversed within an hour after he received the initial four units of fresh frozen plasma and vitamin K.  Gindea Dep. 24:13-17.  Moreover, Dr. Gindea, after analyzing Viera's platelet count, hematocrit, APTT, and INR, as well as physical symptoms such as swelling of the abdomen, concluded that this data supports the theory that

Viera died from consumption coagulopathy.[9]  Dr. Gindea explains
that all of the medical evidence, the rise in APTT, the drop in
platelets, the drop in hematocrit, as well as the constant INR
and swelling of the abdomen, support this theory.  Dr. Gindea
states that this must be the cause of Viera's death: "I can't
think of any other explanation that would explain all of these
changes between admission and the second set of blood tests."
Id. at 29:2-4.  Indeed, Dr. Gindea testified that Viera's APTT
rise could only be explained by either Viera's use of a drug
called Heparin, which everyone agrees Viera was not using, or
consumption coagulopathy.  Id. at 28:6-13.

Dr. Gindea's medical opinion provides the more
thorough and complete analysis of Viera's medical evidence.
Moreover, he explains that Dr. Eaton's assessment of the stable
INR values is incomplete.  See id. at 31:3-8 ("I cannot

---

[9]     Consumption coagulopathy, explains Dr. Gindea, occurs
when there is massive trauma and severe bleeding.  Gindea Dep.
26:18-19.  After such trauma, "the body activates factors to try
to clot the ongoing bleeding and that mechanism eats up all of
the clotting factors such that the patient is no longer able to
clot and he consumes his clotting factors."  Id. at 26:20-24.
As a result, the body is unable to stop this bleeding.

Defendant contends that this consumption coagulopathy
theory is outside the scope of Dr. Gindea's expert report.
Defendant never objected to the introduction of this theory at
the trial deposition.  Accordingly, any such objection was
waived.  Cf. Fed. R. Evid. 103(a).

understand how that is not addressed because to understand what
happened to this patient and to understand, in fact, what
happens to many patients who have trauma, the cause of death is
very often consumption coagulopathy."). Dr. Gindea explains
that the initial four units of fresh frozen plasma should have
brought Viera's INR down within about an hour to a normal INR of
around 1. He opines that after the next hour, the time of the
next blood test, Viera's INR rose back to 2.9 because of the
consumption coagulopathy. See id. at 31:9-15. Dr. Gindea does
not dispute that Viera's Coumadin treatment made trauma
management worse. Yet, references to Viera's Coumadin treatment
and Viera being fully "Coumadinized" in the medical records are
not inconsistent with his opinion. He opines first that any
initial effects of Coumadin would have been reversed; second, he
opines that complicated trauma management does not necessarily
result in a contributing cause of death when, as was the case
with Viera, the injuries were extensive. Accordingly, Dr.
Gindea concludes, "to a reasonable degree of medical certainty,"
that Viera died solely because of his injuries, and that
Coumadin, while it may have increased Viera's bleeding, did not
in the end contribute to his death. In short, Dr. Gindea opines
that Viera's injuries were such that Viera would have died as a

16

result of the head-on motorcycle accident even if he had not been taking Coumadin at the time of the accident.

### G.   Cause of Viera's Death

Having reviewed and considered all of the evidence, the Court, as fact finder, finds Dr. Gindea's expert opinion more persuasive than Dr. Eaton's opinion as it provides a more comprehensive explanation of the cause of Viera's death.  The contemporaneous medical records do not clearly indicate that the Coumadin contributed to Viera's death to the extent that his injuries would not have resulted in his death regardless of the Coumadin.  Indeed, Dr. Kurtzman's postmortem report supports a different conclusion.  Nowhere in this report does he indicate Coumadin caused or contributed to Viera's death.  Accordingly, Viera died from the injuries sustained in his head-on motorcycle accident.  These injuries were so severe that Viera's Coumadin did not cause or otherwise contribute to his death.  He would have died from his injuries regardless of his Coumadin treatment.

**IV.   CONCLUSIONS OF LAW**

The Court first must determine the appropriate standard of review.  Next, the Court must determine whether Viera's death was covered by the Policy.  Finally, the Court must determine whether Defendant's denial of benefits was correct.

**A.   Standard of Review**

The Third Circuit explained that, in this case, the Court must review Defendant's denial of benefits de novo.  Under this de novo standard, the Court must determine whether "LINA properly denied Plaintiff recovery under the Policy." Viera, 642 F.3d at 418.  Viera provides that on de novo review "the role of the court is to determine whether the administrator . . . made a correct decision." Id. at 413 (omission in original) (internal quotation marks omitted).  The Court gives the administrator's decision no deference and reviews the record to "determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." Id. at 414 (internal quotation marks omitted).

Under an ERISA benefits plan, as is generally the case in insurance law, the claimant bears the burden of proof that a benefit is covered by the plan.  See McCartha v. Nat'l City

18

Corp., 419 F.3d 437, 443 (6th Cir. 2005).  An ERISA plan administrator, however, has the burden of proof to show that an exclusion precludes coverage.  See id.; Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 257 (2d Cir. 2004).

    B.   Whether Viera's Death was Covered Under the AD & D Policy

Defendant does not contest that Viera's death was a "Covered Loss" or that Plaintiff satisfies the criteria as a "Covered Person" under the AD & D Policy.  Defendant does argue, however, that Viera's death was not a "Covered Accident" because, in Defendant's view, Viera's death was "contributed to by disease, Sickness, mental or bodily infirmity."  R. at 27. In this case, Defendant denied Plaintiff's claim based upon the Medical Condition Exclusion.  See R. at 46, 60.  Defendant did not deny Plaintiff's claim on grounds that it was not a "Covered Accident."  Id.  Defendant's argument now that the Court should find in its favor because Viera's death was not a "Covered Accident," at this late stage, is unavailing.  See Viera, 642 F.3d at 418 (providing that Court must determine whether "LINA properly denied Plaintiff recovery under the Policy").  In any event, for the reasons below, the Court finds that Viera's death was a "Covered Accident."

C.    Whether Defendant's Denial of Benefits was Correct

Under its de novo review, the Court must determine whether Defendant properly denied Plaintiff's claim under the following exclusion:

> [A]ny Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from . . . Sickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof, except for any bacterial infection resulting from an accidental external cut or wound or accidental ingestion of contaminated food.

R. at 32.

As a threshold matter, the Court finds that Viera's atrial fibrillation is a "Sickness, disease, bodily or mental infirmity, bacterial or viral infection" that is medically treated with Coumadin.  Id.  Although Plaintiff argues that atrial fibrillation is not a bodily infirmity, it does not argue that it is not a disease or sickness.  Dr. Eaton called atrial fibrillation a "bodily infirmity," Eaton Dep. 16:8-10, while Dr. Gindea called it a "medical condition," Gindea Dep. 50:18. Plaintiff provides no argument that atrial fibrillation is not a disease or sickness.[10]

---

[10]    Indeed, Plaintiff presented a similar argument on summary judgment, arguing that Coumadin treatment was not a "medical or surgical treatment" of a "Sickness, disease, bodily or mental infirmity, bacterial or viral infection" because

Next, the Court must reach a conclusion of law as to whether Plaintiff's claim was properly excluded under the Medical Condition Exclusion.  Within the Third Circuit, when a policy excludes from coverage losses caused by pre-existing conditions that cause the loss directly or indirectly, in whole or in part, "there can be no recovery if pre-existing disease contributed to the [loss]."  Shiffler v. Equitable Life Assurance Soc'y of the U. S., 838 F.2d 78, 84 (3d Cir. 1988); see Nally v. Life Ins. Corp. of N. Am., No. 07-0707, 2007 WL 4390423, at *9 (E.D. Pa. Dec. 4, 2007), aff'd, 299 F. App'x 125 (3d Cir. 2008).  Accordingly, the Court must answer this single question: Given the extent of Viera's injuries, would he have died regardless of his Coumadin treatment?  See Ann Arbor Trust Co. v. Can. Life Assurance Co., 810 F2d 591, 593 (6th Cir. 1987) ("When a policy insuring against accidental death contains

---

"medical or surgical treatment" was written at the end of the list of ailments excluded from coverage.  The Court rejected this argument, and the Third Circuit affirmed this judgment. While the Court's conclusion was under the abuse of discretion standard, the Court finds no reason to alter its previous conclusion now under the de novo standard of review.  What is more, in its summary judgment briefing, Plaintiff appeared to concede that atrial fibrillation is a sickness.  See Pl.'s Mot. for Summ. J. 11, ECF No. 26 ("LINA's argument fails on its face because it incorrectly argues that the medical treatment (i.e. the Coumadin treatment) of Mr. Viera's sickness or bodily infirmity (i.e. his atrial fibrillation) was a contributing factor in Mr. Viera's death.").

21

exclusionary language substantially to the effect that benefits are precluded where death directly or indirectly results from or is contributed to by disease, the inquiry is properly limited to determining if the accident alone was sufficient to cause death directly and independently of disease . . . .”).  Under the facts as found by the Court, the Court answers this question in the affirmative.

Dr. Gindea's testimony and expert opinion supports the Court's finding, as does the medical evidence of record in this case.  In particular, Dr. Gindea concluded that, based on a review and consideration of all of the medical data, Viera's injuries were so severe that Viera would have died regardless of his Coumadin treatment.  In this regard, Dr. Gindea explained that any effects of the Coumadin would have been reversed within an hour after treatment began.

The fact that Viera's INR remained at around 2.8 when the second blood test was taken, approximately two hours after the first test, does not disturb this conclusion.  Dr. Eaton opined that these consistent INR's over a two-hour period demonstrate that the emergency room physicians could not reverse the Coumadin's effects.  On the other hand, Dr. Gindea explained that, in his opinion and looking at the other blood-test values, the Coumadin's effects were reversed within one hour, but

Viera's INR elevated back to 2.9 within the next hour because of the consumption coagulopathy.  The Court finds that this consumption coagulopathy theory better explains Viera's blood values and is consistent with the description of the extent of Viera's injuries.  In the end, the Court finds that Dr. Gindea's testimony and medical opinion is more robust and more persuasive than Dr. Eaton's medical opinion.

       Dr. Gindea's opinion is entirely consistent with the other medical evidence in this case.  In particular, the emergency room physicians all indicate that Viera's Coumadin treatment exacerbated his bleeding.  Dr. Gindea does not dispute this point.  Indeed, he states, "[B]y virtue of the fact that the patient [Viera] was on Coumadin his management was profoundly more complicated than it would have otherwise been." Gindea Dep. 45:1-4.  Dr. Gindea explained, however, that just because the Coumadin affected the trauma management does not necessarily mean it contributed to Viera's death.  Dr. Gindea opined that the Coumadin's effects had been reversed by the initial infusion of four units of fresh frozen plasma and vitamin K.  Indeed, reviewing doctor, Dr. William Hilty, supports Dr. Gindea's opinion.  See R. at 107 ("He was given 10 units of subcutaneous vitamin K, as well as 4 units of fresh frozen plasma being ordered to try to reverse his

anticoagulation."). Viera's body could not keep up with the blood loss and his clotting factors were consumed. With no ability to clot, Viera died from blood loss. In short, regardless of the fact that Viera was on Coumadin, which did indeed increase his bleeding, Viera's injuries were such that any increase in bleeding from the Coumadin did not in the end cause or contribute to his death. The Court finds that the bleeding caused by Viera's significant injuries was sufficiently extensive to be the independent cause of his death. Accordingly, Defendant has failed to satisfy its burden that the policy excludes Plaintiff's coverage.[11]

## V.   CONCLUSION

For the reasons set forth above, the Court finds that Defendant did not properly deny Plaintiff's claim under the AD & D policy. The Court will enter judgment in favor of Plaintiff and against Defendant in the amount of $400,000. An appropriate order will follow.

---

[11]     At best, the evidence is equipoise. Defendant has the burden of proof when denying coverage based on an exclusion in the Policy. Accordingly, Defendant failed to carry its burden and judgment will be entered in Plaintiff's favor.